FILED
COURT OF APPEALS
DIVISION II

2013 MAR 12 AM 8: 39

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42215-8-II |
| Respondent, | |
| v. | |
| ARTHUR CHARLES SETH, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. – Arthur Charles Seth appeals his jury trial convictions for first degree child rape and second degree rape. He argues that (1) the trial court erred when it admitted testimony about the victim's statements to her mother, sister, and a nurse practitioner; and (2) jury instructions that used the term "victim" were a judicial comment on the evidence. Holding that the trial court did not commit reversible error, we affirm.

## FACTS

### I. RAPES

In June 2008, 11-year old AMV[1] accompanied her 14-year-old friend M to visit M's 41-year-old family friend Arthur Charles Seth. According to AMV, while they were at Seth's residence, M sat on the couch, smoked marijuana, and drank alcohol with Seth; AMV sat on the

---

[1] We use initials for the victim, her family members, and minor witnesses to preserve their privacy.

nearby bed and smoked a cigarette. After five to ten minutes, Seth got up from the couch, pushed AMV down onto the bed, and forced her to engage in vaginal intercourse with him. When AMV attempted to scream, he threatened to hurt her and her family if she was not quiet. After the rape, AMV woke M, who had apparently passed out, and the two girls left. On the way back to M's house, AMV told M about the rape; but AMV was unsure whether M heard her because M was drunk and "high." 1 Verbatim Report of Proceedings (VRP) at 149. At M's house, AMV called her mother for a ride. On the way home, AMV was more quiet than usual. After this, AMV refused to speak to M, and their friendship ended.

The day after the rape, AMV told her parents that Seth had made her feel "uncomfortable" by placing his hands on her shoulder and telling her she was "hot." 1 VRP at 99, 114. But AMV did not tell them about the rape because she was ashamed and unsure of how her parents would react because they had disapproved of her friendship with M. Following this incident, AMV became more argumentative at home and started to use drugs and drink alcohol, to cut herself, to run away from home, to be truant from school, and to associate with gang members.

After a fight with her parents about two years later, AMV finally told her younger sister SV that something "traumatic" had happened to her (AMV) during her last visit with M. 1 VRP at 90. SV called their parents and told them what AMV had said. When AMV's parents returned, AMV told them that Seth had raped her. The family called the police. Although AMV did not know Seth's name, she identified him in a "photo laydown." 1 VRP at 80.

Pediatric nurse practitioner Marsha Stover examined AMV at the Arthur D. Curtis Children's Justice Center. To determine whether AMV had any physical or psychological issues

and whether she needed any counseling or psychological services, Stover asked AMV what had happened. AMV told her that M's "uncle"[2] had pushed her onto his bed, covered her mouth, threatened to hurt her family, and raped her. Based on AMV's disclosures, Stover recommended some physical tests and a "mental health assessment." 2-A VRP at 202-03.

AMV was diagnosed with post-traumatic stress disorder (PTSD), after which licensed clinical social worker Kip Kryger treated her at a residential facility. During treatment, AMV told Kryger that she had been raped when she was 11-years old, describing the rape as she had described it to Stover. AMV also described the rape to clinical psychiatrist Dr. Linda Erica Schmidt.

## II. PROCEDURE

The State charged Seth with first degree child rape and second degree rape. The information also alleged that (1) the child rape charge was a "predatory" offense because "the perpetrator of the crime was a stranger to the victim," and (2) the second degree rape victim was under 15 years old at the time of the offense. Clerk's Papers (CP) at 46.

### A. Motions in Limine

Seth moved to exclude AMV's disclosures to "her sister, her mother, her father, the detective, the social worker and the psychiatrist" as inadmissible hearsay. CP at 49. He also argued that this testimony could not be used to bolster AMV's credibility. The State responded that (1) it did not intend to introduce any hearsay statements "other than the potential statements regarding statements for medical diagnosis or treatment specifically for psychological and

---

[2] M called Seth her "uncle" even though he was only a family friend. 2-B VRP at 304.

psychiatric treatment" from Stover and Dr. Schmidt; and (2) AMV's statements to Stover were intended for medical treatment and diagnosis, not to gather information for litigation. 1 VRP at 7. The trial court "provisionally" ruled that Stover's testimony was admissible "under the hearsay exception," but it invited Seth to "convince [it] otherwise" if he "came up with something." 1 VRP at 15-16.

Seth also moved to exclude any cumulative testimony from "family members, social worker, psychiatrist, officers regarding the complaining witness['s] reporting." CP at 50. Denying this motion, the trial court ruled this type of evidence admissible to "counter[ ] the delayed reporting theory." 1 VRP at 28. The trial court also ruled SV could not testify that AMV had said she had been "raped" because that specific portion of her statement was inadmissible hearsay. 1 VRP at 46.

### B. Trial

#### 1. State's evidence

##### a. AMV

AMV testified as described above. In addition, she testified that she told Stover, Kryger, and Dr. Schmidt about the rape, her subsequent drug and alcohol use, and other behavioral issues to facilitate her medical and psychological treatments.

##### b. SV

In addition to testifying about AMV's friendship with M and AMV's behavioral changes around the time that friendship ended, AMV's sister, SV, testified about AMV's disclosure. The State initially asked SV:

Do you remember a time that—well, did your sister . . . tell you anything about anything happening to her or that she happened [sic], traumatic happening to her, without going into the details? Just do you remember if there was any—her telling you anything traumatic happening [sic] to her?

1 VRP at 89. Seth objected on hearsay grounds. The State argued that this testimony was not being introduced for the truth of the matter asserted. After the trial court reminded the State about the order in limine, the State rephrased its question and asked SV if AMV had said "that something traumatic had happened to her when she was out with her friend" M. 1 VRP at 90. Seth did not object to this question; and SV responded that AMV had reported something "traumatic," which had prompted her (SV) to call her parents and to tell them what AMV had said. 1 VRP at 90.

### c. AMV's mother

AMV's mother testified about how AMV and M's friendship had changed after AMV's last visit with M. Soon after AMV's last visit with M, AMV's mother noticed behavioral changes in AMV; AMV had explained that she had realized that M was "not her true friend" or "not her real friend because of the situation she had put her in." 1 VRP at 114. When AMV's mother inquired further, AMV told her that (1) they "had stopped at the uncle's house," (2) the uncle "had offered her [(AMV)] drugs and alcohol" but "she had not done it," and (3) "he had grabbed her shoulder and told her that she was hot." 1 VRP at 114.

When the State asked about SV's call, AMV's mother testified that SV had asked their parents to come home because AMV "had told her something that had happened to her and [SV] didn't know how to deal with it." 1 VRP at 116. Seth did not object to this testimony. AMV's mother further testified that when she and her husband arrived home, AMV was "very upset,

distraught, crying, [and] had a hard time breathing"; "actually physically threw up," then "told [her parents] what had happened," and said that she felt "shamed." 1 VRP at 116-17. Seth objected on hearsay grounds. The trial court allowed this testimony as "a statement of emotional or physical condition." 1 VRP at 117.

### d. Stover

Nurse practitioner Stover testified that the purpose of AMV's physical examination was "to find out what ha[d] happened to [AMV] to assess for potential injuries" and to determine how AMV was "coping" in both the physical and psychological sense. 2-A VRP at 191. When the State asked Stover what "specifically" AMV had said was her reason for being examined, Seth objected on hearsay grounds. 2-A VRP at 191. The State responded that the trial court had already addressed this objection in limine. The trial court ruled that this evidence came "within a hearsay exception" and allowed it. 2-A VRP at 191-92.

Stover then read from her report, which stated, without identifying the assailant, that AMV had said, "'He pushed me on the bed. He covered up my mouth and then he threatened to hurt my family. And I didn't want that to happen, so I went quiet.'" 2-A VRP at 192. The State then asked Stover if she used this information to determine whether AMV needed "counseling or psychological services." 2-A VRP at 192. Over Seth's relevancy objection, Stover testified that this information was important because it allowed her to understand that "this event was very traumatic for [AMV]." 2-A VRP at 193.

On cross-examination, Seth asked Stover to read her report's "history from the child," which stated:

I spoke to [AMV] after speaking to her mother. I asked her what had happened to her and she seemed to hear well and she was well groomed and her speech was clear.

And [AMV] tells me that she spent the night at [M's] house, and she said [M] asked her uncle if she could go over there. And [AMV] said:

They were smoking and drinking all day and her uncle asked me if I wanted pot, and I told him no. He got out of control.

After we were done, I started crying and I told [M] what happened and she said he wouldn't do that.

2-A VRP at 199-200.

### e. Kryger

Kryger testified that AMV had been diagnosed with PTSD and that during one therapy session, she had reported "that she was raped at the age of eleven." 2-A VRP at 210-11. He described in detail AMV's description of the rape and the events leading up to it, which description was substantially consistent with AMV's trial testimony. Kryger explained that (1) AMV's talking about what had happened to her was "critical" to her treatment, and (2) many of AMV's behavioral issues that arose after her friendship with M ended were consistent with PTSD following a traumatic experience. 2-A VRP at 215. Seth did not object to any of this testimony.

### f. Dr. Schmidt

Dr. Schmidt testified that (1) while examining AMV, she had asked if AMV had experienced any "significant stressor"; (2) AMV had reported that "she was raped by an adult male at the age of eleven who was a friend's uncle"; (3) she (Dr. Schmidt) needed to know this information to form a medical opinion about AMV's condition; and (4) it was not unusual for an 11-year-old to delay reporting "sexual trauma" for "a number of years" due to feelings of shame and guilt. 2-B VRP at 277, 282. Seth did not object to this testimony.

### 2. Defense evidence

M testified that she and AMV had been inside Seth's residence for only a short time, played some video games, and then went outside to play on a trampoline. She denied that Seth had offered them marijuana or alcohol. M further testified that AMV had been within her sight the entire visit, Seth did not rape AMV, and AMV had never told her that Seth had raped her.

Seth denied having raped AMV or having threatened her family. He "vaguely" recalled the girls' visit, but he denied having offered them alcohol or marijuana. 2-B VRP at 329. He claimed that they had only watched some television together for a short time with his son present, after which they all had gone outside to play on a trampoline.

### 3. Jury Instructions

Instruction 1 provided in part:

> A trial judge may not comment on the evidence. It would be improper for me to express, by words or conduct, my personal opinion about the value of testimony or other evidence. I have not intentionally done this. If it appeared to you that I have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely.

CP at 95-96 (Instruction 1).

Instruction 12 provided in part:

> You will also be given special verdict forms for each charge. If you find the defendant not guilty of a charge, do not use the special verdict form for that charge. If you find the defendant guilty of a charge, you will then use the special verdict form for that charge and fill in the blank with the answer "yes" or "no" according to the decision you reach. In order to answer a special verdict form "yes," you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer.
> The special verdict forms will ask you to answer these questions:
> Count 1 - was the offense *predatory*?
> Count 2 - Was *the victim* less than fifteen years of age at the time of the offense.

CP at 107 (Instruction 12) (emphasis added). Consistent with this instruction, the special verdict

form for count 2 provided in part:

> This special verdict is to be answered only if the jury finds the defendant guilty of Rape in the Second Degree as charged in Count 2.
> We, the jury, return a special verdict for the offense charged in Count 2 by answering as follows:
> QUESTION: Was the *victim* less than fifteen years of age at the time of the offense?

CP at 113 (emphasis added).

Instruction 13 provided:

> "Predatory" means that the perpetrator of the crime was a stranger to *the victim*. "Stranger" means that *the victim* did not know the offender twenty-four hours before the offense.

CP at 108 (Instruction 13) (emphasis added). Seth neither proposed any instructions nor

objected to any of the trial court's instructions. The jury found Seth guilty of both offenses and

answered yes to the special verdicts for both counts. Seth appeals.

## ANALYSIS

### I. AMV'S DISCLOSURES

Seth first argues that the trial court denied him a fair trial when it (1) allowed Stover to

testify about AMV's statements during her physical examination, which Seth characterizes as a

"forensic examination" rather than for purposes of medical treatment; and (2) allowed AMV's

mother and sister to repeat AMV's rape allegations. Br. of Appellant at 18. The State responds

that (1) Stover's testimony about AMV's statements to her was admissible under ER 803(a)(4) as

statements for medical diagnosis or treatment; (2) AMV's statements to SV and her mother were

admissible under ER 803(a)(3) as statements of then-existing mental, emotional, or physical

condition; and (3) even if admission of these statements was error, it was harmless. We agree that any potential error in allowing Stover, AMV's mother, and SV to testify about AMV's disclosures was harmless in light of the other testimony in this case. Therefore, we do not address whether this testimony was inadmissible hearsay.

We review the trial court's evidentiary rulings for abuse of discretion. *State v. Ellis*, 136 Wn.2d 498, 504, 963 P.2d 843 (1998). A court abuses its discretion when its evidentiary ruling is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons'"[3] or if "no reasonable person would take the view adopted by the trial court." *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997) (citing *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)). Evidentiary error is grounds for reversal only if it results in prejudice. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Neal*, 144 Wn.2d at 611 (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). And a trial court's erroneous admission of hearsay statements is harmless when the jury has heard substantially similar testimony without objection. *State v. Weber*, 159 Wn.2d 252, 276, 149 P.3d 646 (2006) (quoting *Ashley v. Hall*, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999)), *cert. denied*, 551 U.S. 1137 (2007).[4]

---

[3] *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

[4] *See also State v. Dixon*, 37 Wn. App. 867, 874-75, 684 P.2d 725 (1984) (admission of written statement as excited utterance was error but was harmless because "[t]he trial judge heard essentially the same details testified to by [the victim] as were included in the [erroneously admitted] written statement.").

Despite his claim of reversible error in the trial court's admission of AMV's statements about the rape to her mother, sister, and Stover, Seth does not challenge the trial court's admission of Kryger's or Dr. Schmidt's testimonies about AMV's disclosures of the rape to them. Kryger's and Dr. Schmidt's testimonies about AMV's disclosures were, at the very least, the same as Stover's, AMV's mother's, and SV's testimonies. Moreover, Kryger's testimony was much more detailed than the challenged testimonies and it was substantially similar to AMV's non-hearsay trial testimony.[5] We hold, therefore, that Stover's, AMV's mother's, and SV's brief, less detailed testimonies about AMV's disclosures were clearly harmless.

## II. NO COMMENT ON EVIDENCE

Seth next argues that the trial court commented on the evidence in giving jury instructions 12 and 13 and the special verdict instruction for the second degree rape charge because they presupposed that AMV was a victim of a crime,[6] which was a question for the jury.

---

[5] We also note that Seth himself elicited the more detailed testimony about AMV's disclosure to Stover.

[6] Seth relies on *State v. Carlin*, 40 Wn. App. 698, 700 P.2d 323 (1985), *overruled on other grounds by City of Seattle v. Heatley*, 70 Wn. App. 573, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994). *Carlin* is not instructive here. In *Carlin*, a police-dog handler testified that his dog found the defendant because it had followed a "fresh guilt scent." *Carlin*, 40 Wn. App. at 700. The court held that this statement, "[p]articularly where such an opinion is expressed by a government official," could improperly influence the fact finder. *Carlin*, 40 Wn. App. at 703. But *Carlin* involved a statement from a witness that, taken in context, implied that the witness believed the defendant was guilty of the charged offense. Here, in contrast, the context in which the trial court gave the instructions did not in any way suggest that the trial court believed Seth was guilty; instead, they were given in a context that required the jury to have found Seth guilty before it considered those instructions.

No. 42215-8-II

Assuming, without addressing or deciding, that Seth can challenge these instructions for the first time on appeal,[7] this argument fails.

"[A]ny remark that has the potential effect of suggesting that the jury need not consider an element of an offense could qualify as judicial comment." *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

> Article IV, section 16 of the Washington Constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." Through this provision, "the framers of the constitution could not have more explicitly stated their determination to prevent the judge from influencing the judgment of the jury on what the testimony proved or failed to prove." *Bardwell v. Ziegler*, 3 Wash. 34, 42, 28 P. 360 (1891); *accord State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). A judge comments on the evidence if the comment suggests the judge's attitude toward the merits of the case or the judge's evaluation relative to the disputed issue. *State v. Lane*, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). It is thus error for a judge to instruct the jury that "matters of fact have been established as a matter of law." *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997).

*State v. Zimmerman*, 130 Wn. App. 170, 174, 121 P.3d 1216 (2005), *remanded for reconsideration on other grounds*, 157 Wn.2d 1012 (2006). "Judicial comments are presumed to be prejudicial, and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted." *Levy*, 156 Wn.2d at 723.

Contrary to Seth's assertion, neither Instruction 12 nor the special verdict instruction for count 2 presupposed that AMV was a victim of a crime or in any way removed this question of fact from the jury's consideration. Rather both instructions clearly advised the jury that it was to

---

[7] *See* RAP 2.5(a).

12

No. 42215-8-II

address the special verdict about the "victim['s]" age *only* if it first found Seth guilty of the charged crime. CP at 107, 113. To find that Seth had committed a charged crime, the jury had to find that there was a victim. *See* CP at 102 (Instruction 7) (requiring the jury to find that Seth had sexual intercourse with AMV and that AMV was under 12 years old at the time and was at least 24 months younger than Seth), 104 (Instruction 9) (requiring the jury to find that Seth had engaged in sexual intercourse by forcible compulsion with AMV). These instructions did not convey any personal opinion on the part of the trial court about whether AMV was the victim of a crime; nor did they suggest that the jury was relieved of its burden of considering whether AMV was the victim of a crime.

Similarly, Instruction 13 neither constituted a judicial opinion about whether AMV was a victim of a crime nor suggested that the jury was relieved of its burden of deciding whether AMV was the victim of a crime. Rather Instruction 13 simply defined (1) the special verdict term "[p]redatory" as meaning "that the perpetrator of the crime was a stranger to *the victim*," and (2) "[s]tranger" as meaning "that *the victim* did not know the offender twenty-four hours before the offense." CP at 108 (Instruction 13) (emphasis added). In providing these definitions, this instruction stated merely that if and when a predatory or stranger-related crime occurs, it is the relationship of the perpetrator and the victim that is important and that it is the jury that must determine whether they were strangers. Furthermore, the instructions as a whole made clear that the jury was to apply these definitions only *after* it first determined that Seth had committed a

13

crime and that thus there *was* a victim. We hold, therefore, that the challenged instructions were

not erroneous.[8]

We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Hunt, J.

We concur:

_____
Johanson, A.C.J.

_____
Bjorgen, J.

---

[8] Even if these instructions could be viewed as comments on the evidence, the record shows that any error was harmless. The trial court instructed the jury on the elements of each offense without using the term "victim." *See* CP at 102, 104 (Jury Instructions 7, 9). And, as we explain above, the three instructions Seth now challenges were clearly to be considered by the jury only *if* and *after* it had determined that Seth had committed a crime. Thus, even if the challenged instructions had been improper, their use of the term "victim" in this context was not prejudicial. *See State v. Alger*, 31 Wn. App. 244, 248-49, 640 P.2d 44, *review denied*, 97 Wn.2d 1018 (1982) (trial court's single reference to the prosecuting witness as "the victim" when advising the jury of a stipulation as to the marital status of the victim and defendant was harmless when viewed in the context of the entire trial). Furthermore, the trial court instructed the jury that it must disregard any apparent judicial comment on the evidence; and we presume that the jury follows the trial court's instructions. *State v. Stein*, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). Taken together, these circumstances show that the alleged comment on the evidence, even if error, was harmless.